# AFFIDAVIT

1.  My name is James G. McAdams, III, and I am submitting the following affidavit to this Court in support of the response by the United States of America in the case of *James Faller and Barbara Murray v. United States*. From January 1982 until January 2006, I was an Assistant United States Attorney. Attached hereto as Appendix A and made a part hereof is my Curriculum Vitae in which I set forth my educational and professional background for the Court's consideration in reviewing this Affidavit and in responding to the allegations set forth in the petitioners' pleadings.

2.  In preparation for writing this affidavit, I have reviewed annotations that I personally made of the trial transcripts as well as written submissions made to the Department of Justice in support of letters rogatory to Luxembourg and Switzerland and electronic copies of certain government's pleadings submitted to the Court in this case. In all events, this affidavit is based on my best recollection of the matters discussed herein; however, this affidavit is not submitted as a complete statement of all known information relevant to the matters addressed herein.[1]

3.  On or about April 23, 1998, then United States Attorney Thomas Scott transferred the case of *United States v. Richard Adam, et al.*, Case No. 97-6068-Cr-Ryskamp, to me from the previously-assigned prosecutor who had overseen the investigation, indictment, and pre-trial discovery and case preparation. At that time, Judge Ryskamp had set trial to commence on May 18, 1998.

---

[1] A summary of the facts of the underlying case is set forth at Appendix B. The Presentence Investigation Reports prepared as to defendants MURRAY and FALLER in this case also set forth a summary of the evidence upon which the government relied in prosecuting the defendants.

4. During my initial meeting with the previous prosecutor, which occurred on the following day, I was advised that no government exhibit list or witness list had yet been prepared and further that interviews of the most victims of the fraud had not been done. I also learned that there were some witnesses in the country of Luxembourg who might have relevant information concerning the primary defendant, RICHARD ADAM. Those witnesses included law enforcement officers from the country of Luxembourg who, along with the Belgian police, had executed a search warrant at certain facilities controlled by ADAM. I also learned that the government had submitted a motion to Judge Ryskamp seeking a continuance of trial for, among other reasons, the absence of primary defendant RICHARD ADAM who was in custody in Canada fighting extradition to the United States. Finally, I was informed the FBI Case Agent who had investigated the case since its initiation in 1994 had transferred to a FBI office in another state.

5. A few days after the foregoing meeting, then AUSA Jim Hopkins was also assigned to the case. In early June 1998, the final member of the prosecution team, Gregory Baker, a contract paralegal hired by the United States Attorney's Office, arrived in West Palm Beach to begin working on the case.

6. At or about the end of the first week in May 1998 Judge Ryskamp entered an order continuing trial in the case for six months to allow the United States the opportunity to have RICHARD ADAM extradited and thereby avoid multiple trials in the case

7. Although I do not recall the precise date, at or about this time AUSA Hopkins and I initiated contact with the respective defense attorneys, including Steven Chaykin, attorney for defendant FALLER, Michael Pasano, attorney for Barbara MURRAY, and Reuben Garcia, attorney for defendant ROLAN COLON. Our message

to the attorneys was simple: we are new to the case and, to ensure a complete discovery process, our decision was to make all evidence in the government's case against COLON, FALLER and MURRAY available to defense counsel for inspection and, at their discretion, duplication.

8.   Within a few weeks thereafter, AUSA Hopkins and I initiated contact with Reuben Garcia, attorney for ROLAN COLON, concerning a guilty plea by COLON to conspiracy and cooperation with the United States in return for a substantial assistance motion at sentencing.  Although I do not recall the precise date upon which that agreement was finalized, defendant COLON did ultimately elect to enter such a plea agreement with the United States, which agreement became part of the record in the criminal case.

9.   Following the execution of the plea agreement between the USAO and COLON, AUSA Hopkins and I commenced debriefing of him in preparation for his anticipated testimony at the trial in December 1998.  Initially, attorney Garcia was present for those meetings.  From Mr. Garcia we received copies of notes that COLON had made about conversations he had with FALLER while the two of them were in federal detention at Palm Beach County Jail.  Those notes reflected certain strategies for beating their case that FALLER and COLON had discussed while incarcerated together.

10.   Later during 1998, attorney Steven Chaykin sought leave of the Court to withdraw from the case.  Citing irreconcilable differences with his client, Mr. Chaykin advised the Court that he and defendant FALLER had a difference of opinion concerning the defense of his case and that, in light thereof, he no longer felt that he could adequately defend Mr. FALLER.  Mr. Chaykin further advised that FALLER had

decided to retain other counsel. The Court granted Mr. Chaykins' motion and not long thereafter attorneys Craig Gillen and Jerry Froelich of Atlanta filed notices of appearance with the Court as co-counsel for defendant FALLER.

11.     In the fall of 1998, the Court, over defense objections, granted the government's second motion for continuance and set trial off for another six months in light of defendant RICHARD ADAM's continued absence from the Court's jurisdiction as he fought extradition to this country from Canada.

12.     From time to time during the fall of 1998 and into 1999, the defense attorneys for defendants FALLER and MURRAY and/or members of their staff personally visited the U. S. Attorney's Office in West Palm Beach, Florida, to view the government's evidence and files. The materials that were made available to them included all documents and items seized during the search of the Fort Lauderdale office of International Business Services Alliance (IBSA), which office was managed by ROLAN COLON, in May of 1994, documents that had been accumulated during the grand jury investigation by virtue of subpoenas, and any other materials in the U. S. Attorney's Office's possession. In short, the defense attorneys were given access and the opportunity to duplicate, or have duplicated, any evidence in the government's possession. We did not give access during the discovery process to agent reports, attorney memoranda, and other work product.

13.     In December 1998, AUSA Hopkins, Gregory Baker, and I traveled to Luxembourg pursuant to a letter rogatory request from the government of the United States to the government of Luxembourg. The purpose of that trip was to view the documents that had been seized from RICHARD ADAM by law enforcement authorities in Luxembourg and Belgium when they executed search warrants for the office of IBSA-

Luxembourg and for the Belgium residence of RICHARD ADAM, respectively. Assisting us was Ms. Collette Ford, the United States Department of Justice's representative at the U. S. Embassy in Geneva, Switzerland. Ms. Ford, unlike Mr. Hopkins, Mr. Baker, and me, was fluent in French and Italian and was therefore present to assist the three of us in reviewing documents in those languages to determine what, if any, relevance they might have to the government's case.

14. The process of reviewing documents in Luxembourg took a total of about four days. Before departing Luxembourg, we duplicated a number of the documents shown to us by the Luxembourg police. Many of those documents related to corporations that were apparently set up by RICHARD ADAM in Luxembourg. Other documents were apparent communications by ADAM to various individuals, some whom we recognized by name, others whom we did not recognize but which we duplicated in the offhand possibility that the relevance thereof might later become apparent. At the conclusion of the process, paralegal Gregory Baker remained behind for one additional day to organize the documents into loose-leaf binders and to arrange with the Luxembourg authorities to ship those binders to us in Florida. After those documents arrived in Florida, and during one of the many discovery conferences that took place in this case, defense counsel for MURRAY and FALLER were allowed to review the contents thereof. Mr. Baker and/or FBI case agents were present when they did so. Subsequent to that review by defense counsel, they and I had discussions concerning the documents, including the fact that many of them were in French and whether the government would be obtaining translations of those documents. Although then-AUSA Hopkins and I contemplated obtaining such translations, to the best of my

recollection, we ultimately did not do so inasmuch as none of them were relevant to the prosecution of the case.

15.     As of the date of this document, I do not recall the specific contents of any of the documents other than that some referred to corporations that mimicked, either exactly or closely, the names of some of the U.S. victim's corporations.  In any event, the documents in Luxembourg were, in many cases, identical to corporate documents and correspondence that had been seized from COLON's office during the execution of the search warrant in May 1994.  In none of those documents did I perceive any evidence whatsoever that could conceivably be *Brady* material or otherwise discoverable to the defense unless they were to be government exhibits at trial. Moreover, as previously stated, defense counsel were given the opportunity to review and duplicate those documents, just as we had afforded them access to all other evidence in the government's possession after Mr. Hopkins and I took over prosecution of the case.

16.     While AUSA Hopkins, Mr. Baker, and I were in Luxembourg, we were also searching for information and evidence relevant to defendant FALLER, in particular, to the approximately one month that he spent there with defendant RICHARD ADAM in or about August of 1993.  Our investigation had shown that, following his return to the United States from that trip, he and co-conspirator COLON had formed a new company, First Quantum International, and had commenced marketing the same type of loans that they had previously been marketing through IBSA, though of smaller principle amounts. A few items that we observed while in Luxembourg related to a company formed by ADAM in Europe called "First Quantum."  The materials that we saw in Luxembourg concerning "First Quantum" were largely duplicates of documents that were seized

6

during the search of COLON's office in May 1994. Though the name was similar to FALLER's new company, FQI, we found nothing to suggest any substantive connection between the two entities.

17. In 1998 and 1999, I interviewed witnesses in Geneva, Switzerland, pursuant to requests honored under the Mutual Legal Assistance Treaty between the United States and Switzerland. The trips to Switzerland were for the purposes of interviewing witnesses who were knowledgeable of FALLER's activities during the conspiracy in this case and thereafter as well as information concerning possible false testimony that FALLER had given during a pre-trial hearing. In none of the information obtained in Geneva did I perceive any evidence whatsoever that could conceivably be *Brady* material or otherwise discoverable to the defense unless they were to be government exhibits at trial.

18. During the period of time between May 1998 and late 1999, AUSA Hopkins and I interviewed many of the victims of the fraud. In some cases those persons had previously been interviewed by an agent of the FBI, either the case agent or an agent from another office who conducted the interview at the request of the case agent. Prior to and during each interview conducted by Mr. Hopkins or me, we reviewed and referred to FBI reports, if any, concerning a prior interview of that victim. While I noted an occasional discrepancy between statements attributed to a witness and what the witness said during my interview of that witness, in my capacity as co-prosecutor I did not attach significance to such discrepancies that rose to the level of *Brady* material. As to no witness that I interviewed, whether they ultimately testified for the government or not, did I conclude that the witness was lying or otherwise was aware of or had possession of exculpatory information.

19. In particular, defendants FALLER and MURRAY have from time to time suggested that Truman Bidwell, an attorney with White and Case in New York City, could have provided exculpatory evidence as to either or both defendants. At my request, Mr. Bidwell agreed to be interviewed by me in late 1999. Present with me was an FBI agent from the Manhattan Office but who was not familiar with the case. Mr. Bidwell brought his attorney to the interview, which took place in the United States Attorney's Office in Manhattan. During that interview, Mr. Bidwell confirmed that he had represented Barbara MURRAY in connection with her business, International Business Services Alliance, Inc. (IBSA), and that Ms. MURRAY had, in 1992 or 1993, asked him to check into the validity of the "self liquidating loans" that she was already marketing for RICHARD ADAM. Mr. Bidwell advised that he had spoken with ADAM by phone and had attempted to meet with him in Switzerland while he was there anyway on another matter. According to Bidwell, his efforts to obtain information from ADAM were not successful, however, and he was unable to venture an opinion one way or the other about the loan program. Mr. Bidwell was very careful during the interview to avoid affronting his obligations to Ms. MURRAY pursuant to the attorney/client privilege. Overall, the impression that he conveyed, more by what was not said than by what was said, was that he never really understood the loan program and that he neither counseled MURRAY to proceed or to refrain from proceeding. At the end of the interview, Mr. Bidwell quite candidly stated that he did not want to be called as a witness by either party because his testimony would be of no value to either party. Somewhat surprised that he had not already been contacted by the defense, I informed Mr. Bidwell that he would likely receive such a call, after which the interview was terminated. I am

also aware that, at a later date, AUSA Hopkins also interviewed Bidwell; however, I was not present for that meeting.

20.   Near the end of the trial of defendants MURRAY and FALLER in April and May 2000, the government called FBI Special Agent Kevin Luebke as its Rule 1006 Summary Witness to testify concerning the money flow from the fraud by ADAM, COLON, MURRAY, and FALLER.  Agent Luebke, who is an accountant, using the various reports and statements that had been amassed in this case, prepared charts and delivered testimony concerning the payments by the victims to MURRAY, COLON, and/or FALLER, the transfer of collected advance fees to ADAM, ADAM's kick-backs to MURRAY, COLON, and FALLER, and the disbursal of those funds by MURRAY, COLON, and FALLER.  He prepared a similar analysis for the advance fees that FALLER and others involved in the FQI venture collected from FQI victims.

21.   Two days before Agent Luebke was scheduled to testify, AUSA Jim Hopkins, who was to conduct the direct examination of Luebke, delivered copies of the documents, primarily FBI 302's, upon which Luebke's summary testimony would be based and which were therefore discoverable as Jencks material.  The following morning, defense counsel for both MURRAY and FALLER complained to Judge Ryskamp that there were countless discrepancies between the testimony of certain government witnesses at trial and their prior statements as reflected in those reports and that such constituted *Brady* material subject to disclosure prior to trial.  Both AUSA Hopkins and I were shocked by the allegations.  Personally, my first thought was that perhaps we had overlooked something that should have been disclosed earlier.  After speaking briefly about the matter, AUSA Hopkins and I agreed that, regardless of the validity of the defense attorneys' assertions about the nature of the statement, we would

9

offer to bring any of the witnesses back to Court that were requested by defense counsel. We did so; however, they declined that offer, choosing rather to ask the Court for a mistrial. The Court denied that motion and the trial proceeded to conclusion.

22. In May of 2003, RICHARD ADAM made his initial appearance in this case having lost his last appeal in Canada seeking to have that government block his extradition to the United States. The Court ordered ADAM, a Canadian citizen who at that point had spent some six years in a Canadian prison while fighting extradition, to be held in pre-trial detention as a risk of flight. Following ADAM's subsequent arraignment, I commenced the process of discovery with his defense attorney, Maria Elena Perez. Both FBI case agents had been transferred and were no longer available; the FBI assigned to assist me a new agent who had no knowledge of or prior involvement in this case. During our initial meeting, Ms. Perez advised me that her legal mentor was Michael Rosen, an attorney in Miami who had briefly represented ROLAN COLON very early during the government's investigation in 1994. I knew that Mr. Rosen was very familiar with the post-verdict litigation in the MURRAY and FALLER case because he had actually testified in one of the many hearings that occurred in connection with that litigation. I encouraged Ms. Perez to contact Michael Pasano, MURRAY's defense attorney, to obtain copies of his discovery materials. I also provided her with the same access to the government's files and materials as had been accorded to MURRAY's and FALLER's attorneys back in 1998-2000. Because the FBI investigative reports were already in the hands of the other attorneys, I also permitted her access to those reports during discovery, even though that was not required. As in the earlier instance, I allowed her to duplicate or to have duplicated whatever documents that she wanted copied. Ms. Perez' review process was overseen by the newly-assigned FBI agent.

10

23. At the time of my discovery conferences with Ms. Perez, Mr. Baker was no longer under contract as a paralegal with the U.S. Attorney's Office and Jim Hopkins had become a United States Magistrate Judge. I had returned to my assigned office in Fort Pierce, Florida, and, thus, when I was in West Palm Beach on the ADAM case, I was without any assistance or support. At the conclusion of the trial of MURRAY and FALLER in 2000, Mr. Baker had organized all of the government evidence, reports, correspondence, etc., and placed those materials in boxes and filing cabinets in a room at the U.S. Attorney's Office. Interspersed among those materials was government work product, that is, notes by Mr. Hopkins and me, a fact that during the lapse of time prior to ADAM's extradition I had forgotten. Accordingly, unintentionally, the government allowed Ms. Perez to review and duplicate those materials which were certainly beyond the scope of both the Court's discovery order and Rule 16 of the Federal Rules of Criminal Procedure.

**FURTHER AFFIANT SAYETH NAUGHT.**

Date: <u>October 13, 2006</u>_____

<u>/s/ *James G. McAdams, III*_____</u>
James G. McAdams, III

# APPENDIX A
# CURRICULUM VITAE

## JAMES G. MCADAMS, III (Jim)

**EDUCATION:** B.A., Psychology, 1970, Davidson College, Davidson, North Carolina. J.D., May, 1981, University of Miami School of Law; graduated Cum Laude; Law Review, 1979-81.

**PROFESSIONAL EXPERIENCE:**

* **July 1997 to April 2006.** Senior Litigation Counsel, United States Attorney's Office, Southern District of Florida
* **June 1995 to June 1997.** Attorney General Janet Reno's Counsel for Intelligence Policy, Department of Justice, Washington, D.C.
* **October 1994 to June 1995.** Special Assistant to Counsel For Intelligence Policy, Office of Intelligence Policy and Review, Department of Justice, Washington, D.C
* August **1992 to October 1994.** Managing Assistant U. S. Attorney, West Palm Beach, Florida.
* **May 1992 to July 1992.** Executive Assistant to U. S. Attorney, Miami, Florida.
* **January 1992 to May 1992.** United States Attorney for Southern District of Florida (Key West to Vero Beach).
* **October 1988 to January 1992.** Chief of Narcotics Division, U.S. Attorney's Office, Miami, Florida
* **January 1982 to October 1988.** Assistant U.S. Attorney, Miami, Florida.
* **June 1981 to December 1981.** Associate, Malcolm B. Wiseheart, Jr., PA, Miami, Florida.

**SIGNIFICANT PROFESSIONAL ACCOMPLISHMENTS:**

**1998 - 2006: Participated as instructor in Continuing Legal Education program at U.S. Attorney's Office, Southern District of Florida, focusing on Intelligence Law, Classified Information Procedures Act, Foreign Intelligence Surveillance Act, and Trial Advocacy.**

**2002 - 2004:** *United States v. Dr. Paul Elliott.* Prosecuted prominent physician for multiple counts of health care fraud involving billing for services not rendered and obstruction of justice.

**2002 - 2003:** *United States v. Dr. John Minarcik and Dr. Leonard Walker.* Prosecuted two pathologists for health care fraud involving the insurance billings for unnecessary medical procedures.
**June 2000 to December 2002.** *United States v. Fabio Ochoa, et al.* Handled all classified document review and litigation under Classified Information Procedures Act (CIPA) in the prosecution of the last leader of the Medellin Cocaine Cartel.

January 1998 to January 2006. Member of Department of Justice Evaluation and Review Staff. Assisted in conducting statutory peer reviews of U. . Attorney's Offices throughout the United States for compliance with constitutional, statutory, regulatory, and DOJ policy requirements.

**April 1998 to February 2003.** *United States v. RICHARD ADAM, et al.* Lead prosecutor in a financial fraud case involving multi-million dollar losses to dozens of victims. Convicted two major defendants after three week trial. Remaining defendants pled guilty.

**October 1998 to October 2002.** *United States v. Viramontes, et al.* (Miami Cuban Spies Case). Handled all litigation under Classified Information Procedures Act (CIPA) pertaining to disclosure and use of classified documents in the prosecution stemming from the shoot down of two American aircraft in international waters by intelligence agents from Cuba.

**June 1995 to June 1997.** Served as Attorney General Janet Reno's Counsel for Intelligence Policy and staff liaison to the Intelligence Community.  Supervised Department of Justice's Office of Intelligence Policy and Review, including preparation of Attorney General's Daily Briefing, wiretap and search applications under the Foreign Intelligence Surveillance Act, and preparation and staffing of national security issues for the Attorney General.

**October 1994 to July 1997.** Appointed by Attorney General Reno as Co-chairman of the Joint Intelligence Community Law Enforcement Working Group (representatives: White House National Security Counsel, Central Intelligence Agency, National Security Agency, Federal Bureau of Investigation, Defense Intelligence Agency, Department of Defense, Drug Enforcement Agency, Department of State, Department of Energy).  Proposed and developed protocols to coordinate interaction of the intelligence and law enforcement communities and for prudent and responsible use of intelligence community resources and information when necessary in criminal cases.

**November 1992 to September 1993.** *United States v. Drogoul, et al.* ("Iraqgate" case), $5 billion dollar bank fraud case in the Northern District of Georgia involving diversion of U.S. Department of Agriculture credits by Saddam Hussein and others in order to purchase weapons.  Handled classified document review and CIPA litigation at trial and appellate levels.

January 1992 to May 1992. Appointed as United States Attorney for the Southern District of Florida by then Attorney General William Barr.  Served as his appointee while the White House was engaged in the search for a new political appointee.

**December 1989 to January 1992.** Member of prosecution team in *United States v. Manuel Noriega*.  Supervised team of attorneys and staff to review classified document in Central America, Europe, and the United States and thereafter to litigate under CIPA the admissibility at trial of classified documents provided to Noriega during discovery.

**HONORS:** Department of Justice, Executive Office Director's Award for Superior Performance, November 2002, presented by Attorney General John Ashcroft and Director of Executive Office of U.S. Attorneys.

Attorney General's Distinguished Service Award, presented by Attorney General William Barr on December 14, 1992

Central Intelligence Agency, Certificate of Appreciation for Excellence in *United States v. Noriega,* May 15, 1992

1991 Vince Antle Outstanding Federal Prosecutor Award for the Southern District of Florida

Department of Justice, Executive Office Director's Award for Outstanding Achievement, presented October, 1988

Florida Crime Prevention Officer's Association, Palm Beach County Distinguished Service Award, 1994

**APPENDIX B**

**UNITED STATES v. RICHARD ADAM, et al.
SUMMARY OF FACTS**

**FRAUD**

This case involved an advance fee scheme in which the defendants conspired to defraud and defrauded victims of large sums of money with the false and empty promise of obtaining multi-million dollar loans for those victims. The defendants were charged with that conspiracy as well as with several counts of mail/wire fraud, and with money laundering conspiracy relating to the unlawful proceeds of the advance fee scheme.

Defendant ADAM began his scheme to defraud on a small and relatively unsophisticated scale in South Florida in 1987. The scheme flourished, expanded and became more sophisticated when ADAM joined with Barbara MURRAY in April 1992. They agreed to operate under the mane of MURRAY's existing business, International Business Services Alliance, Inc. (IBSA of Stamford), located in Stamford, Connecticut. MURRAY ran the IBSA of Stamford office where she employed a number of salespersons.

In October 1992, ADAM opened IBSA of Florida, Inc., a Florida corporation located at 2411 N.E. 32nd Court, Lighthouse Point, Florida. Corporate documents reflect ADAM as president, co-defendant ROLAN COLON as vice-president, and co-defendant Barbara MURRAY as secretary/treasurer.

Approximately three months later, in January 1993, ADAM and co-defendant James FALLER opened IBSA of Tampa, Inc., also a Florida corporation. Those corporate documents reflected James S. FALLER II as president, ROLAN COLON as

vice-president, RICHARD ADAM as secretary, and Barbara MURRAY as treasurer. IBSA of Tampa maintained its office at 14497 N. Dale Mabry, Suite 250, Tampa, Florida.

Defendant ADAM opened IBSA of Luxembourg, or IBSA, S.A., on March 2, 1993. He established the principal place of business for IBSA, S.A. at 32, Rue Jean-Pierre Brasseur, Luxembourg.

Each of the above-described IBSA offices, under the guidance and control of RICHARD ADAM, purported to arrange so-called Euro-dollar loans of $10 million or more for borrowers by acting as an intermediary to a private funding source. The Tampa office also purported to arrange conventional commercial loans of $2.5 million. Allegedly, that source was a private trust based in Europe that was selectively willing to loan funds at a very modest interest rate. In essence, the scheme was as follows:

**CONVENTIONAL LOANS:** Each proposed borrower was required to pay a due diligence fee in the amount of $3,000. Once IBSA supposedly had done its due diligence and determined the loan applicant to be a good risk, the applicant was so advised and told to pay an additional $25,000 to IBSA. None of the prospective borrowers ever received the loans for which they applied.

**EURO-DOLLAR LOANS:** Each proposed borrower was required to pay a $3,000 due diligence fee plus $25,000 for IBSA's expenses. Next the applicant had to pay $225,000 to IBSA to cover the cost of setting up a holding company in Luxembourg. Finally, each applicant was told that he/she had to provide $100,000 to IBSA to be used to fund a bank account for the applicant in the name of the holding company.

ADAM trained Barbara MURRAY, ROLAN COLON, and James FALLER in this technique. He taught them how to make a detailed presentation of the sophisticated financing allegedly available through IBSA. The pitch, in brief, was this:

1. ADAM was trustee of a multi-billion dollar trust based in Europe that had been in existence for many years. In particular, ADAM was a relative of the founder of the trust. At different times during the scheme, ADAM or his associates stated that the name of this trust was the OMNI Trust located in France, or the Multika Trust formed in Vaduz, Liechtenstein, and domiciled in Luxembourg.

2. The trust documents were very strict about requiring collateral for any money withdrawn from the trust and would only fund loans for projects that it deemed socially worthy.

3. Conventional loans were available to approved clients seeking funds of between $2.5 million and $10 million.

4. Euro-dollar loans were available to approved clients seeking funds of $10 million and up.

5. Euro-dollar loans were self-collateralized (no collateral was needed to secure the loans) and self-liquidating (the loans did not have to be repaid) and were funded as follows:

    a. Prime bank guarantees (PBGs) or notes with a total face amount equal to seven times the amount of the loan were purchased.[2]

---

[2] A bank guarantee, or letter of credit, is a bank instrument by which the issuing bank guarantees a receiving bank that it will indemnify the latter institution in case of default by the person or entity in whose favor the guarantee was issued. The government's research has shown that bank guarantees are not available for purchase by the public;

> Early in the scheme, the loan applicants were told that they were responsible for obtaining the PBGs. Subsequently, the scheme changed to provide that IBSA, through RICHARD ADAM, would obtain the PBGs necessary for the loan. So, for a $10 million dollar loan, $70 million in PBGs were purchased.

---

rather they are inter-bank agreements. Accordingly, they could not form the basis of the transactions at the heart of the IBSA scheme to fund Euro-dollar loans.

    b.    The bank that sells the PBGs discounted the cost thereof to 75% of face value, or $52.5 million for $70 million of PBGs.

    c.    The PBGs were then provided to the trust as collateral for the principal amount of $70 million. The PBG's purportedly offered a modest interest coupon which amount would inure to the benefit of the trust.  In addition, each of the trust directors would receive an incentive fee equaling 1% of the face amount of the loan in exchange for approving the loan, or a total of $5.6 million.

    d.    The remainder, or the "fallout," equaled approximately $11 million. This, according to the pitch, was the source of the loan funding and fees from the borrower to IBSA.

Money flowed to ADAM from the victims lured in by MURRAY in Connecticut, by COLON in Fort Lauderdale, and by FALLER and his sales forces to IBSA of Tampa, Stamford, and Fort Lauderdale.  By 1993, ADAM had begun spending most of his time in Europe, primarily in Luxembourg, where these funds were sent to him by his co-defendants.  ADAM would thereafter send money to MURRAY, COLON, and FALLER for commissions, operational costs, salaries, bonuses, etc. at their individual offices. From the late 1980's through early 1994, the defendants took approximately USD $4,900,000 from loan applicants without providing funding for a single loan.

During August 1993, FALLER spent several weeks in Luxembourg with ADAM and in other nearby areas.  Exactly what transpired between ADAM and FALLER during that time is unknown; however, when FALLER returned to the United States, he was, by accounts of those who knew him, a changed man.  Most relevantly, according to

ROLAN COLON, FALLER almost immediately proposed that the two of them form their own company to market similar loans to would-be borrowers as they had been doing for ADAM at IBSA. In a matter of weeks, they opened First Quantum International, Inc. (FQI), through which FALLER and, to a lesser extent, COLON marketed loans that were, like the IBSA loans, "self-liquidating loans," but involved smaller principal amounts. FALLER's employees at IBSA-Tampa also were involved in FQI. FALLER, through FQI, convinced several would-be borrowers to pay the required advance fee for a loan. As with the IBSA loans, however, none of the FQI loans were funded.