UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CASE NO. 06-60544-Civ-Ryskamp/Torres**
**(Criminal Case No. 97-6063-Cr-Ryskamp)**

**BARBARA MURRAY,**

       Movant,

v.

**UNITED STATES OF AMERICA,**

       Respondent.
_____/

**UNITED STATES' SUPPLEMENTAL RESPONSE TO**
**PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS**

      THE UNITED STATES OF AMERICA, through its undersigned Assistant United States Attorney, respectfully files this supplemental response to the Petitioner's petition for writ of habeas corpus pursuant to Title 28 U.S.C. §2255, with additional comment on the documents provided by Petitioner pursuant to the Court's discovery order, and states as follows:

      James Faller and Barbara Murray's petitions for writ of habeas corpus refer to a number of documents which he claims include *Brady* material which would have changed the outcome of his trial, if he had the material before trial. Faller has provided copies of documents which he intends to rely upon for his § 2255 petition claims, as ordered by this Court, although he stated at the hearing that there may be other documents. Presumably, those documents will be provided to the court and government counsel prior to any hearing on this matter.

Page 1 of  14

**FACTUAL BACKDROP**

In order to discuss the relevance, materiality and probative value of any of the documents provided by Faller, it is important to place the discussion in the context of the government's theory of prosecution at trial.  Petitioners Faller and Murray were charged with defrauding victims who were seeking financing of their business projects, by telling them that they could obtain financing for them from a European trust that had billions of dollars in funds available to lend through the use of "self-liquidating loans." While there were many witnesses who testified regarding the details of the scheme, the government's theory in essence was that Faller and Murray lied to most if not all of the victims by telling them – or implying strongly – that they had clients who had ALREADY been funded, meaning they had received multi-million dollar loans from the same European source.   The borrowers then were asked to front fees, typically $350,000, which were they were told would be used to set up banking and corporate entities in Europe to obtain the multi-million dollar loans.

The government's theory was not that these types of loans were theoretically impossible.  Could a rich European trust have lent out money in the way Faller, Murray and others described?  In theory – maybe.  Even the lawyers who were consulted on these dealings did not appear to understand the intricacies of how the "self-liquidating loans" were supposed to work, a topic which will be addressed *infra*. Could these loans have been structured in a way that theoretically was legal and permissible?  That question was never definitively answered at trial, but the point here is that it was not the government's theory –  nor was the government required to prove – that these loans were **impossible** to obtain.  The government alleged, proved and the

jury agreed that petitioners Faller and Murray and others engaged in a scheme to defraud by lying to the borrowers when they implied and in many cases outright told them that other borrowers had actually received millions of dollars in loans from the same European lenders.

So, in terms of any determination of whether certain documents contain references to whether or not the loans could theoretically have been legitimate, or legally permissible, that question was not relevant and material to the jury's finding that the defendants lied about the fact that no loans ever actually funded. Simply put, any defense that the "self-liquidating loans" being promoted by petitioners were legal and proper was no defense at all to the evidence that they lied to victims by telling them loans had been made by the millions.

To establish a violation under <u>Brady v. Maryland,</u> 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a defendant must show that (1) the government possessed evidence favorable to the defendant; (2) the defendant did not possess the evidence and could not have obtained the evidence with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different. <u>United States v. Vallejo,</u> 297 F.3d 1154, 1164 (11th Cir.2002) (internal citation omitted).

As the government has already argued in its initial response to the petition and as reflected in the affidavits attached thereto, the government made available to the defense all the documentary evidence in its possession at the time before the trial in this case. FBI 302's and work product of the prosecution team were not made available in

discovery – since they are not required to be made available under the law – but those materials were reviewed by trial counsel for the government prior to trial for *Brady* and were deemed to contain none. These materials apparently were inadvertently shown to counsel for Richard Adam later, along with all the other discovery which had been made available to Faller and Murray.

For purposes of the discussion that follows, even assuming *arguendo* that the documents referred to by Faller were never shown to the defendants, he has not shown – and cannot show – that any of these documents were material to the issues at trial, that is, that their disclosure would have provided a reasonable probability that the outcome would have been different. Indeed, the vast majority of the documents he has provided have no relevance to the issues at trial and are certainly not exculpatory in any event.

Moreover, it is not clear from the copies of the documents now provided by Faller where they came from. It appears that many of the lawyers' documents (those of Truman Bidwell and Steven Brenners, for example) could have been obtained by the defendants from the lawyers directly before trial, as these men were not called as government witnesses but rather were prospective defense witnesses and the defense had equal access to them for the purpose of preparing for trial. Through due diligence, the defense could have obtained the documents. <u>Vallejo,</u> 297 F.3d at 1164.

In the discussion that follows, the documents are referred to as Volume 1 (consisting of 580 sequentially numbered pages) and Volume 2 (consisting of 410 sequentially numbered pages). The two volume, numbered sets of copies will be provided to the court and to petitioners for ease of reference in the case.

**The Truman Bidwell Documents**

In his petition for writ of habeas corpus, Faller argues that the "government, through the testimony of each and every witness totally destroyed the good faith of Faller's reliance on lawyers." Petition at 11. He points to correspondence with Truman Bidwell, of White & Case, quoting a section of a letter Bidwell wrote to co-defendant petitioner Barbara Murray and referring to Bidwell's statement "Furthermore, if the name of this firm is to be associated with the product, I must be able to vouch for its legitimacy," and referring to his plan to meet with a Dr. Hoss in Europe to help explain to him "the particularities of the Luxembourg laws and banking practices." This letter, which was written from Bidwell to Barbara Murray and which presumably would have been in her possession at the time of trial, included the following language which was not quoted by Faller:

> As promised I write to summarize my plans for assuring myself, both on behalf of my firm and yourself, that the proposed financings that you are engaged in with the Trust in Luxembourg are both appropriate and lawful.
>
> **First of all, as I have told you, the materials which you have been using in connection with your presentations to prospective borrowers are both incomplete and confusing.** Inasmuch as the securities laws in this area are quite vague and even though the offering is probably private as opposed to public, **one must comply with relevant disclosure practices or risk liability for failing to do so.** Accordingly, I have prepared a list of questions which require answers so that we may write a document which will be more complete and comprehensive and will make full and fair disclosure of the relevant facts.
>
> Of course, the underlying question which everyone of the potential borrowers that has contacted me has raised is whether or not I can vouch for the legitimacy of the funds in the trust. As you well know, and for reasons with which you are familiar, I have not felt that it would be appropriate to

>           spend the time and money to make the requisite
>           investigation to be able to respond to these questions.

Volume 1 at p. 61-62; emphasis added.  While there is one other letter included from Bidwell which mentions his planned trip to Europe, there is nothing in the petitioner's documents indicating that Bidwell ever completed the follow up he alluded to and issued any opinion that the loan program was legal.   Nor are there any letters showing that he obtained the assurances he referred to and was willing to give them to Murray or anyone else.  Again, even if he had issued such an opinion, that would have done nothing to reverse the fact that both petitioners had repeatedly told the borrower/victims that they **knew** that loans had been funded in the past and would be funded to them.  These documents are not exculpatory for either petitioner.

This fact is supported by the notes of interview entitled "Declarations Attributed to Attorney Truman Bidwell" in which Bidwell is noted to have told Bruce Bronson that he "did not know much about the company making the loans, because his representation was of Murray as an individual."  He said he believed one loan had been funded, because he "would have heard about it had the person not received the funding that was promised" but later qualified his statement, saying "I think it's done."  Vol. 1 at 241.

The notes reflect that Bidwell told two potential borrowers, Raymond Deck and David Chase, that Murray was "acting as something of a broker, but Bidwell knew very little else about the business."  Vol. 1 at 241.   While there are other references to statements that Bidwell apparently made to other witnesses, there are no time frame references for the statements and, in any event, Truman Bidwell was Murray's lawyer and a prospective defense witness whom Murray's trial lawyer, Michael Pasano, chose not to call as a witness at trial.  As we noted in the government's original response,

when Michael Pasano was asked by the judge at the hearing whether he had access to documents of Truman Bidwell, Pasano answered, "No question, Your Honor. And we made a tactical decision with respect to it. There is no question that we had them, and that we are not objecting to our lack of having them. I could not. In fact, we waived any privilege to allow White and Case to give them to the Government. And, in fact, the Government counsel and I had discussed the Government's accessing them, and Government counsel was very forthright." *Id* at 13. The Bidwell letters and references to interviews of him cannot now be considered *Brady* material.

### The Steven Brenners Documents

Faller has included in his documents a number of letters sent to prospective borrowers by an attorney named Steven Brenners. He has also included notes that paralegal Greg Baker, who was on the prosecution team, made during an interview with Brenners. In those notes, Baker noted that Brenners "is unaware of any loan that IBSA ever funded." Vol. 1 at 194. There are many notes in the document that are completely consistent with the trial evidence and the government's theory at trial. Faller claims in his petition that the Brenners documents show that "the government walked Colon through a litany of testimony that the Goverment possessed evidence Colon's testimony was patently false." It does nothing of the sort.

In fact, in the only reference found in the notes that could possibly taken to be helpful to petitioner Faller's defense is one line in the Baker interview notes that says "JF [Faller] (or possibly RC, but SB thought it more likely JF [Faller]) called SB [Brenners] and wanted to know where the funding was." Vol. 1 at 194. However, there is no date for this comment, Brenners wasn't even sure whether it was Faller, and in

any event, that comment could have come for any number of reasons, not the least of which was that Faller was worried that the borrower/victims he had taken money from were going to complain – or complain louder if they already had started – about not receiving the funding as promised.  Again, overall the notes provide much fodder for the prosecution theory of the case, and nothing even approaching a material, relevant statement that is exculpatory for either petitioner.[1]

Moreover, Steven Brenners was not a government witness. He was equally available to the defense and could have been (and likely was) interviewed by the defense, who could have similarly obtained documents from Brenners if there were any exculpatory material to be had from him.  There was not.

Brenners sent out numerous letters to IBSA borrow/victims telling them that funding was coming.  He was apparently echoing what was being told him by Richard Adam in Europe.  Yet, Brenners himself told Baker in the interview that he was "unaware of any loan that IBSA ever funded" according to Baker's notes.

The Baker notes of the Brenners interview, coupled with the letters Brenners wrote to borrower/victims, are completely consistent with the testimony of Colon at trial that when Adam told people that the money was going to be coming into Mr. Brenners

---

[1] In a notation that seems to support the government's theory that Faller intended to take business for his own new company, First Quantum International (which Faller set up with co-defendant and cooperating witness Rolan Colon) away from the IBSA program being run by co-defendant Richard Adam in Europe, Baker notes that Brenners said  "Either RC [Colon] or RA [Adam] told SB [Brenners] not to speak with JF [Faller], because JF was gonna compete with IBSA."   Vol. 1 at 194.

trust account, "those were more lies, right?"  Answer: "Those were lies."  The documents do not offer any exculpatory material to the contrary.

### The Luxembourg Documents

There is a series of documents, many in German, at pages 87 to 160.  As with so much of what has been provided by Faller, it is impossible to determine the arguable relevance of these documents to the issues at the trial of Faller and Murray.  Many of them bear dates well beyond the period of the conspiracy (i.e. letter dated 11.07.1994 at Vol 1, page 118; deposit slip for 620,000 dated 28.04.1994 at Vol. 1, page 156).  It remains hard to respond to such documents without some guidance as to why they would have mattered at trial.

The same applies to the documents contained at pages 1 through 140 of Vol. 2.  We are simply at a loss to explain the potential relevance of these documents, much less how they could be deemed to be exculpatory for the petitioners.

### The Baker Interview Notes

Scattered throughout the documents are handwritten notes that appear to be those of paralegal Greg Baker, who was present and took notes during interviews conducted of many witnesses, including some who were called to testify at trial and others who were not.   For example, pages 186 through 294 of Vol. 2 contain many such interview notes, as do pages 323 through 364.  Far from containing exculpatory material, these notes actually contain a plethora of damning representations made by both petitioners.  Here is a sampling of some of the references by Faller and Murray to loans having been funded:

**References in Witness Statements or Interview Notes That
Faller and/or Murray Told People that Loans Had Been Funded**

| NAME | DESCRIPTION OF STATEMENT | PAGE CITE |
|---|---|---|
| Affidavit of Thomas Keaveny | "I was told by both Murray and Colon that the financial consulting busines (IBSA) had previously secured similar multi-million dollar financing through the sophisticated means described in the presentation." | Vol. 1 at 164 |
| Martin Hopwood and Judy Gloss Interview notes | Murray "initially told them that two loans had closed. BM [Murray] said she participated in the closings of two loans. BM told them both that she had successfully funded loans herself using this mechanism." | Vol. 1 at 245 |
| Keith Horton Interview notes | Faller didn't tell him a lot: "it was secretive." Faller "did say 2-3 months for financing." | Vol. 2 at 193 |
| Earl Ball Interview notes | Faller "represented that he had funded several loans on the East Coast of Florida (Miami area) | Vol. 2 at 197 |
| Thomas Looker Interview notes | Murray told him that "IBSA Stamford had funded many more loans than Ft. Lauderdale, etc. because IBSA Stamford was in existence longer." | Vol. 2 at 203 |
| | Faller "bragged or alluded to deals closing in Bahamas." | Vol. 2 at 204 |
| | Faller "told him (and Colon confirmed) that deals were starting to go through" Faller said "they had their own funding - started FQI." | Vol. 2 at 206 |
| Mark Blanchard Interview notes | Faller told him "that they had funded before" and said "he had funded a deal for $30 M" | Vol. 2 at 219 |
| Vince Tifer Interview notes | Faller "put Tifer on phone with Murray who said she had funded loans in the past" Faller and others said "deals closed" Malfa and Faller "clapped hands and said another deal had been done (referring to the transaction just before him)" | Vol. 2 at 247-248 |

| Kent McElhaney Interview notes | Faller told him that "the pay-out would come ninety days after KM signed the closing papers . . . it took ninety days to take care of the paperwork involved in the process." | Vol. 2 at 265 |
|---|---|---|
| | Faller said "there were Billions of dollars that IBSA needed to lend out; JF [Faller] said that they were 'making loans' in the billions" | Vol. 2 at 271 |

**The Lira Bond Discussion**

Faller has pointed to the testimony of co-conspirator Rolon Colon as being somehow contradicted by two documents: notes of an interview with Colon written by Greg Baker, and an affidavit submitted by Debra Price. (Vol. 1 at   .) This is another red herring.

Leonard Neuhaus testified at trial that he had been the CEO and CFO at Lew Lieberbaum, a securities brokerage, while James Faller worked there. (DE 612 at 58.) He testified that Richard Adam was Faller's client and that he deposited a 5 million lira Italian treasury note with the firm and attempted to borrow against is as collateral. Id. At 60-61. The note turned out to be counterfeit. Documents entered into evidence showed that Lieberbaum employees were instructed not to mention to Adam that the note was counterfeit because the FBI was investigating. Gov. Ex. 904.

Neuhaus testified on cross and re-direct that Faller did in fact communicate this with Adam. Id. at 63, 65. The affidavit of Debra Price that Faller points to attempts to impeach this testimony, and also refers to Faller's reporting of Lieberbaum activity to the state Comptroller's office. First of all, this affidavit is dated July 12, 2000, shortly after trial, and almost seven years ago. More importantly, Neuhaus was cross-examined by Mr. Gillen on this subject, who asked him if he was aware that Faller had complained about Lieberbaum to the Comptroller's office. He was not. Id. At 64.

Similarly, Colon testified at trial that Faller had tipped off Adam about the bond. The notes that Baker took were not a verbatim account of what Colon had said during his interview, and would not have been proper impeachment material. Title 18, United States Code, Section 3500; *United States v. Jordan*, 316 F.3d 1215, 1252, 1255 (11[th]Cir. 2003). This "new evidence" is not *Brady* and does not support Faller's claim that Colon did not tell the truth at trial.

In summary, the documents submitted by Faller simply fail to meet the showing that the government "possessed evidence favorable to the defendant," and suppressed it, that the petitioners "did not possess the evidence and could not have obtained the evidence with reasonable diligence," and that there is a "reasonable probability that the outcome would have been different" if the defense had the documents before trial. Even assuming *arguendo* that none of this material was turned over by the government, petitioners have failed to meet their burden of showing a violation of *Brady* under the prevailing standard. Their petitions should be denied.

### REQUEST FOR PERMISSION TO FILE THIS
### SUPPLEMENTAL RESPONSE ONE DAY OUT OF TIME

The United States has consulted with petitioners James Faller and Barbara Murray, who both indicated via email that they had no objection to the one day extension to file this supplemental response. Faller indicated he would like one additional day to file his reply to this pleading. Therefore, the government requests that the Court accept the filing of this pleading one day later than originally ordered by the Court, and allow petitioners to file any reply no later than April 27, 2007.

## CONCLUSION

WHEREFORE THE UNITED STATES OF AMERICA, for the reasons explained herein, respectfully suggests that the petitions for writ of habeas corpus filed by both James Faller and Barbara Murray can, and should, be denied without a hearing.

                                      Respectfully submitted,

                                      R. ALEXANDER ACOSTA
                                      UNITED STATES ATTORNEY

BY:   /s/ *Lauren E. Jorgensen*
        LAUREN JORGENSEN
        ASSISTANT UNITED STATES ATTORNEY
        Florida Bar No. 726885
        Email: Lauren.Jorgensen@usdoj.gov
        500 Australian Ave., N., Suite 400
        West Palm Beach, FL 33401
        (561) 820-8711
        (561) 659-4626 (FAX)

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 17, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the document was served on petitioner Murray via email on the same date.

                    /s/ *Lauren E. Jorgensen*
                    LAUREN E. JORGENSEN
                    Assistant United States Attorney

## SERVICE LIST

**Barbara Murray v. United States**
**Case No. 06-60544-CIV-RYSKAMP/TORRES**
**United States District Court, Southern District of Florida**

| | |
|---|---|
| Lauren E. Jorgensen | Barbara Ann Murray |
| Assistant U.S. Attorney | Pro Se |
| lauren.jorgensen@usdoj.gov | 8 James Lane |
| U.S. Attorney's Office | Westport, CT 06880-2248 |
| 500 S. Australian Ave, Suite 400 | Email: barb77mur@optonline.net |
| West Palm Beach, FL 33401 | [Service via email] |
| Telephone: (561) 820-8711 | |
| Facsimile: (561) 659-4526 | |
| Attorney for United States | |
| [Service via CM/ECF] | |